**IN THE UNITED STATES DISTRICT COURT**
**FOR THE SOUTHERN DISTRICT OF ILLINOIS**

GCS CREDIT UNION,

                **Plaintiff,**

**v.**                              **Case No. 3:20-CV-00937-NJR**

**AMERICAN UNITED LIFE**
**INSURANCE COMPANY,**

                **Defendant.**

# <u>MEMORANDUM AND ORDER</u>

**ROSENSTENGEL, Chief Judge:**

      Pending before the Court is a Motion for Summary Judgment filed by Defendant American United Life Insurance Company ("AUL"). (Doc. 39). Plaintiff GCS Credit Union ("GCS") filed a timely response in opposition to the motion to which AUL filed a timely reply. (Docs. 45; 46). Also pending before the Court is GCS's Motion for Jury Trial. (Doc. 43). AUL filed a timely response to that motion. (Doc. 44). For the reasons set forth below, the motion for summary judgment is granted in part and denied in part, and the motion for jury trial is denied.

## BACKGROUND

      GCS, an Illinois-chartered credit union, sponsors two 401(k) plans, one for its hourly unionized employees and one for its non-unionized salaried employees. (Doc. 39-2, pp. 9, 22). In early 2016, GCS's Human Resources Manager, Debbie Bowen, noticed an issue with the union plan (formally titled the GCS Credit Union Hourly Employees' Savings and Profit Sharing Plan) (the "Plan"). (*Id.* at pp. 31-32). GCS erroneously excluded certain part-time

employees from participating in the Plan violating its terms. (Docs. 39-2, pp. 31-35, 46, 51-52; 39-7, p. 14). GCS's collective bargaining agreement with the union directed that part-time employees were ineligible to participate in the Plan, which conflicted with the Plan's governing document. (*Id.*; Docs. 39-3; 39-5; 39-8).

Taking a step back, the Plan originated in 1996. (Docs. 39-4, p. 10; 39-5). In 2006, GCS engaged AUL, an Indiana-based insurance corporation, to provide investments, administrative services, and recordkeeping for the Plan. (Docs. 39-4, pp. 26-27; 39-11). To facilitate their business relationship, the parties signed an administrative services agreement. (Doc. 39-11). Initially executed in 2006, the agreement was superseded by another in 2007 and later amended in 2018. (Docs. 39-11; 39-12; 39-13). In setting up services, AUL "mapped" GCS's existing Plan provisions onto AUL's form document after reviewing the Plan's provisions through an adoption agreement. (Docs. 39-6, pp. 79-80; 39-11). GCS adopted AUL's standard document. (*Id.*). From 2006 to 2016, GCS modified its Plan through various adoption agreements and amendments. (Docs. 39-9; 45-7; 45-9; 45-10; 45-11). All versions of the Plan included the eligibility requirement. (Docs. 39-3; 39-5; 45-9; 45-10; 45-11). Per the Plan, all employees of at least 18 years of age working for GCS for at least six months could participate in the Plan and receive profit sharing contributions. (Doc. 45, p. 3). Those profit-sharing contributions converted to employer matching contributions after an amendment in 2011. (Doc. 45-9).

Under the agreement, AUL's listed responsibilities included cash and accrual basis accounting, participant financial recordkeeping, recordkeeping of participant eligibility and vesting, performing Internal Revenue Code 401(k)/401(m) nondiscrimination testing, establishing that plan discretionary profit-sharing contributions accorded with Plan terms,

performing up to 10 hours of data reconciliation to evaluate record integrity, and holding money in trust as a custodian, among many other services. (Docs. 39-11; 39-12; 45-6). The administrative services agreements classified these services as "Full Plan Support." (Docs. 39-11; 39-12). While AUL had many contractual duties, GCS recognizes that AUL was not required to make participant eligibility determinations under their agreement — that responsibility fell onto GCS as the Plan sponsor, administrator, and named fiduciary. (*Id.*; Docs. 39-3; 39-9; 45, p. 4).

From 2001 to 2014, GCS employed Janet Wheatley as its Human Resources Manager. (Doc. 45-14, p. 35). In this role, Wheatley worked closely with GCS's Plan administrative service provider. (Doc. 45-14). AUL conducted testing to ensure GCS appropriately contributed to all eligible employees per the Plan with the annual census data provided by GCS. (*Id.*). Initially, the Plan failed annual testing for the first four to five years. (*Id.* at pp. 32-33, 36). Wheatley worked with an AUL employee during this time and observed that most failures occurred with profit-sharing contributions for part-time employees. (*Id.* at p. 33). In Wheatley's understanding, based on the collective bargaining agreement, part-time employees were ineligible for profit-sharing contributions under the Plan. (*Id.*). She informed her contact at AUL about the ineligibility. (*Id.*). The AUL contact told Wheatley that she would send the test results to "compliance" for internal review. (*Id.*). AUL has plan consulting or compliance teams to ask questions about a plan document or review any other issues that arise. (Doc. 45-17, pp. 7-8). After compliance team review, the AUL contact congratulated Wheatley as GCS passed the testing and sent a testing report indicating that GCS passed. (Doc. 45-14, p. 33). Over the years, AUL coded part-time employees differently on the testing sheet and excused them from testing. (*Id.* at pp. 33-34).

Jumping to August 2013, the part-time employee exclusion issue resurfaced for AUL's compliance team. AUL employee Karen Larosa succeeded Wheatley's original AUL contact. (Doc. 39-7, pp. 47-48). In correspondence with the internal compliance team, Larosa inquired about the eligibility date of a recently rehired GCS employee joining the non-union salaried team who had previously worked as a part-time union employee. (Doc. 45-18). The compliance team informed Larosa that the employee satisfied the entry requirements prior to rehire. (*Id.*). Confused, the compliance team member inquired into why GCS stated that the former part-time union employee was not previously eligible for the union plan stating that, so long as the employee met the age requirement, his part-time status should have no impact on his eligibility to participate under the terms of the Plan because the employee achieved the required six months of service. (*Id.*). Larosa did not share this information when answering Wheatley's email about that employee's eligibility. (Doc. 45-19).

After Wheatley left, Bowen replaced her as GCS's Human Resource Manager. (Doc. 39-2, p. 59). While exploring amendment options for the Plan, Bowen observed the disconnect between the collective bargaining agreement and the Plan regarding the eligibility of part-time employees. (*Id.* at pp. 31-33). In January 2016, Bowen contacted AUL for guidance in assessing this issue and determining if GCS was administering the Plan correctly. (*Id.* at p. 43; Doc. 45-8). GCS and AUL met to discuss the ongoing issue. (Doc. 39-2, pp. 43-53). Later that year, in April 2016, AUL's Plan Services Supervisor asserted that AUL had little or no oversight over how GCS accounted for its employees, however, he acknowledged that GCS's failure to comply with its Plan would have been worth mentioning during the past census calls. (Doc. 45-21).

As a result, GCS made corrective payments and incurred $233,326 in costs to rectify

the issue for improperly excluding employees ($31,881 for deferral opportunities, $113,232 for lost matching contributions, and $88,213 for lost earnings to the affected eligible part-time employees). (Doc. 1-1).

GCS originally brought this action for professional negligence and breach of contract in the Circuit Court of Madison County, Illinois, on August 18, 2020. (*Id.*). Primarily, GCS alleges that AUL knew of GCS's non-compliance with the Plan through contractually obligated testing, negligently and incorrectly represented that GCS passed testing, failed to notify GCS of the issue, and intentionally concealed such information causing GCS to owe corrective contributions as required by the Employee Retirement Income Security Act ("ERISA"), 29 U.S.C. § 1001 *et seq.*

AUL subsequently removed the action on September 15, 2020, through diversity jurisdiction and federal question jurisdiction under ERISA. (Doc. 1). Earlier in this litigation, AUL filed a motion to dismiss arguing that GCS's state-law claims were preempted by ERISA (Doc. 14), which the Court denied reasoning that the state-law claims underlying the action do not necessitate interpretation or application of the Plan, nor do they relate to the Plan in any significant way. (Doc. 20). In its motion for summary judgment, AUL raises its ERISA preemption argument again in light of discovery and new caselaw. AUL also contends that, even if this action is not preempted, AUL is entitled to summary judgment because GCS held sole responsibility to determine employee eligibility, not AUL. Moreover, AUL asserts that it does not qualify as a "professional" akin to a lawyer or doctor to substantiate the professional negligence action, and, in any event, the professional negligence claims are barred by the *Moorman* doctrine and lack of expert evidence.

LEGAL STANDARD

A court should grant summary judgment "if the movant shows that there is no genuine dispute as to any material fact and the movant is entitled to judgment as a matter of law." FED. R. CIV. P. 56(a). Assertions that a fact cannot be or is genuinely disputed must be supported by materials in the record, including depositions, documents, electronically stored information, affidavits or declarations, stipulations, admissions, interrogatory answers, or other materials. FED. R. CIV. P. 56(c)(1). Once the moving party sets forth the basis for summary judgment, the burden then shifts to the nonmoving party who must go beyond mere allegations and offer specific facts showing that there is a genuine issue of fact for trial. FED. R. CIV. P. 56(e); *see Celotex Corp. v. Catrett*, 477 U.S. 317, 323-24 (1986). In determining whether a genuine issue of fact exists, the Court must view the evidence and draw all reasonable inferences in favor of the non-movant. *Bennington v. Caterpillar Inc.*, 275 F.3d 654, 658 (7th Cir. 2001); *see also Anderson v. Liberty Lobby, Inc.*, 477 U.S. 242, 255 (1986).

DISCUSSION

I.   **ERISA Preemption**

ERISA encompasses two powerful preemption provisions for complete preemption (ERISA § 502, 29 U.S.C. § 1132), and conflict preemption (ERISA § 514, 29 U.S.C. § 1144). AUL contends that this case is conflict preempted. The relevant provision explains that ERISA preempts "any and all State laws insofar as they may now or hereafter relate to any employee benefit plan." ERISA § 514, 29 U.S.C. § 1144(a). This preemption provision is deliberately expansive and exceptionally broad. *Pilot Life Insurance Co. v. Dedeaux*, 481 U.S. 41, 45-46 (1987).

This broad language must be considered in light of ERISA's overarching objectives. *New York State Conf. of Blue Cross & Blue Shield Plans v. Travelers Ins. Co.*, 514 U.S. 645, 655 (1995)

(ERISA's objectives must be considered "as a guide to the scope of the state law that Congress understood would survive"). In enacting ERISA's conflict preemption provision, Congress aimed "to ensure that plans and plan sponsors would be subject to a uniform body of benefits law…to minimize the administrative and financial burden of complying with conflicting directives" ultimately avoiding inefficiencies that "could work to the detriment of plan beneficiaries." *Ingersoll-Rand Co. v. McClendon*, 498 U.S. 133, 142 (1990). Considering this primary objective, a law "relates to" an employee benefit plan if it has a "connection with or reference to" such plan. *Shaw v. Delta Air Lines, Inc.*, 463 U.S. 85, 96-97 (1983).

The Supreme Court has carved out at least three categories of state law that "relate to" employee benefit plans for ERISA preemption: laws that (1) mandate employee benefit structures or their administration; (2) bind employers or plan administrators to particular choices or preclude uniform administrative practice, functioning as a regulation of an ERISA plan itself; and (3) provide an alternative enforcement mechanism to ERISA. *Trustees of AFTRA Health Fund v. Biondi*, 303 F.3d 765, 775 (7th Cir. 2002) (citing *Travelers*, 514 U.S. at 658-60). Moreover, the Seventh Circuit has held that ERISA preempts a state law claim if the claim requires the court to interpret or apply the terms of an employee benefit plan, but not when the claim merely requires a cursory examination of ERISA plan provisions. *Id.* at 780.

Here, AUL contends that the question at the heart of this case is who bore the responsibility of preventing Plan violations or determining employee eligibility for Plan participation. As such, AUL argues that the Plan must necessarily be interpreted as the answer lies within its terms. According to AUL, the Plan definitively names GCS as the Plan administrator under ERISA with plenary responsibility for ensuring compliance with the Plan. AUL urges that ERISA prevents GCS from outsourcing its fiduciary duties to ensure

compliance with the Plan. Even though the Court already denied a motion to dismiss relating to this argument, AUL highlights the recent Seventh Circuit decision in *Halperin v. Richards,* 7 F.4th 534 (7th Cir. 2021), as well as developments during discovery to resurrect its preemption argument.

Many courts of appeals have held that ERISA does not preempt state-law claims brought against non-fiduciary service providers in connection with professional services rendered to an ERISA plan. *See, e.g., Painters of Philadelphia Dist. Council No. 21 Welfare Fund v. Price Waterhouse*, 879 F.2d 1146, 1153 n. 7 (3d Cir. 1989) (concluding that ERISA does not generally preempt state professional malpractice actions brought by a plan against its external auditor); *Airparts Co., Inc. v. Custom Benefit Services of Austin, Inc.*, 28 F.3d 1062, 1066 (10th Cir. 1994) (holding that ERISA did not preempt a plan trustee's state-law professional negligence and fraud claims brought against an external benefit plan consultant); *Coyne & Delany Co. v. Selman*, 98 F.3d 1457, 1470-73 (4th Cir. 1996) (finding that state professional malpractice claim for negligent failure to procure replacement plan brought against plan insurer was not preempted); *Arizona State Carpenters Pension Trust Fund v. Citibank*, 125 F.3d 715, 724 (9th Cir. 1997) (deciding that a Trust Fund's state-law claims for breach of contract, negligence, and fraud against a bank were not preempted); *Gerosa v. Savasta & Co., Inc.,* 329 F.3d 317, 330 (2d Cir. 2003) (holding that ERISA did not preempt plan trustees' state-law breach of contract and professional malpractice claims against an outside actuary); *Penny/Ohlmann/Nieman, Inc. (PONI) v. Miami Valley Pension Corp.*, 399 F.3d 692, 698-704 (6th Cir. 2005) (finding no ERISA preemption where breach of contract and negligent misrepresentation claims against non-fiduciary service provider concerned defendant's record-keeping and testing services distinct from the employee benefit plan). Within these cases, the courts emphasize that state laws

governing professional (non-fiduciary) duties and contracts generally do not fall into the three categories of cases that "relate to" employee benefit plans identified by the Supreme Court for ERISA preemption. *See Coyne*, 98 F.3d at 1470-72. Moreover, third party service providers are not traditional plan entities subject to ERISA like the principal, employer, plan, plan fiduciaries, plan administrators, or beneficiaries. *See PONI,* 399 F.3d at 700-701. Typically, claims against third-party service providers are not based on rights under the ERISA plan or breach of the plan's terms. *See Airparts*, 28 F.3d at 1066; *see also Arizona State Carpenters Pension,* 125 F.3d at 724 ("[Defendant's] relationship with the Trust Funds was no different from that between [Defendant] and any of its customers."). Additionally, these courts reason that permitting state-law suits to proceed actually strengthens the ERISA system by helping ensure the financial integrity of the plans Congress sought to protect. *See PONI,* 399 F.3d at 700-701; *see also Gerosa,* 329 F.3d at 329.

There is also an indication in the dicta of *Pappas v. Buck Consultants, Inc.* that the Seventh Circuit aligns with these other courts. 923 F.2d 531 (7th Cir. 1991). Although the *Pappas* Court did not specifically address preemption, it refused to find an implied federal private right of action under ERISA against negligent non-fiduciary professionals who caused injury to ERISA plans and their trustees. *Id.* at 539-40. In doing so, the Seventh Circuit opined that "the interest ERISA beneficiaries have in competent plan consultants is already vindicated by the availability of state-law malpractice suits." *Id.* at 540. It is hard to imagine the Seventh Circuit would reference this alternative state-law remedy if it does not exist as AUL suggests here. Moreover, in *Kolbe & Kolbe Health & Welfare Benefit Plan v. Medical College of Wisconsin, Inc.*, the Seventh Circuit found that a plan sponsor and administrator's state law breach of contract action against a hospital touched a traditional area of state regulation not preempted by ERISA

especially considering that resolving the claim required no interpretation or application of the plan itself. 657 F.3d 496, 504-05 (7th Cir. 2011).

GCS's claims fit the mold of the many cases referenced above. The professional negligence and breach of contract claims underlying this action are garden-variety state-law tort claims that do not invoke any Plan provisions or indicate that AUL breached a Plan term. Moreover, these causes of action do not fall into any of the three recognized categories generally triggering ERISA preemption. Here, GCS's claims target the services tendered by a non-fiduciary administrative service provider, AUL, governed by a distinct and separate agreement between the parties. GCS and AUL agree that AUL does not administer the plan and does not serve as a fiduciary to the Plan. AUL's responsibilities are outlined in the administrative service agreement and include testing, record-keeping, and other administrative services in support of the Plan. As such, ERISA does not govern the relationship between GCS and AUL, and GCS's claims do not affect relations between principal ERISA entities.

As the Court previously noted in its Order denying AUL's motion to dismiss, GCS's claims are not subject to ERISA because resolving the claims would not require the Court to evaluate whether AUL violated any terms of the plan. There is no dispute that exclusion of part-time employees violated the Plan. Rather, the Court would only need to consider whether AUL acted negligently or intentionally in misrepresenting testing results and concealing known errors with plan administration, or if AUL breached the operative administrative services agreement. Moreover, these state-law claims in no way thwart ERISA's objectives.

Despite this overwhelming case law, AUL argues that the Seventh Circuit's more

recent ruling in *Halperin* supports its position regarding preemption of state law claims against non-fiduciary contractors. In *Halperin*, the bankruptcy creditor plaintiffs alleged the company inflated its stock value to conceal poor performance and benefit insiders. 7 F.4th at 539. The case involved different types of defendants: the directors and officers of the company (dual-hat fiduciaries), the trustee (single-hat fiduciary), and the trustee's non-fiduciary contractor. *Id.* at 542, 551-53. The Seventh Circuit held that ERISA did not preempt the claims against the dual-hat fiduciaries, but did preempt the state law claims for aiding and abetting a breach of a fiduciary duty against the single-hat trustee and its contractor. *Id.* In deciding this issue, the *Halperin* Court stated that, "[t]he prospect of aiding and abetting liability in this case simply creates too great a risk that single-hat ERISA fiduciaries like [the trustee] would be forced to worry about whether directors and officers were complying with separate corporation-law duties." *Id.* at 551. While the contractor in *Halperin* was not a fiduciary, it still had federal-law obligations under ERISA in serving as the trustee's contractor to complete valuation of the employee stock ownership plan. *Id.* at 553. These obligations inherently stemmed from the trustee's duties. *Id.* The Seventh Circuit recognized that because the contractor incurred ERISA liability if it knowingly aided a breach of fiduciary duty when participating in the valuation process, it acted in a "limited" single-hat ERISA role. *Id.* at 554. Accordingly, the Court concluded that ERISA did not tolerate state laws imposing corporation-law liability on non-fiduciary contractors who perform central ERISA functions, such as plan valuation. *Id.*

AUL attempts to align itself with the non-fiduciary contractor in *Halperin*. This attempt fails. First, the relationship between the parties and the cause of action in *Halperin* are vastly different than in this case. *Halperin* concerned bankruptcy creditor plaintiffs suing

corporate-trustee directors and officers along with another plan trustee and its non-fiduciary contractor. Here, GCS, the Plan administrator, is suing its non-fiduciary contractor, AUL. The plaintiffs in *Halperin* sued the corporate defendants for breach of corporate fiduciary duties, and the trustee and contractor for aiding and abetting those breaches. GCS sues AUL for breach of contract and professional negligence. These are key differences. The Seventh Circuit's analysis in *Halperin* turned on the nature of the claims and their respective remedies provided for in ERISA. Furthermore, unlike the contractor in *Halperin*, AUL has no federal obligations under ERISA to the Plan's beneficiaries alongside its state law obligations to GCS in contract and tort—a fact AUL emphasizes repeatedly in its motion. Moreover, AUL's alleged breaches do not concern performance of core plan tasks like stock program valuation. AUL also argues that allowing a damages remedy in this case clashes with ERISA's remedial limits on claims against non-fiduciaries. To do so, it references the example in *Halperin* discussing an ERISA provision empowering the Secretary of Labor to sue non-fiduciaries for knowingly participating in a fiduciary's breach of duty. Again, the claims at issue are different than the claims in *Halperin* and do not implicate or conflict with this provision of ERISA. As such, AUL's position does not find support in *Halperin*.

For these reasons, the Court finds that GCS's state law claims against AUL are not preempted by ERISA. The Court will now evaluate AUL's motion for summary judgment regarding GCS's professional negligence and breach of contract claims.

## II.    Professional Negligence

Ordinary negligence and professional negligence are two different causes of action that involve two different standards of care. *LaSalle Bank, N.A v. C/HCA Development Corp.*, 893 N.E.2d 949, 959 n. 1 (Ill. App. Ct. 2008). A professional belongs to a learned profession or

works in an occupation that requires a high level of training and proficiency. *Myers v. Heritage Enterprises, Inc.*, 820 N.E.2d 604, 610 (Ill. App. Ct. 2004). A cause of action rooted in professional negligence requires the following elements: (1) the existence of a professional relationship, (2) breach of a duty arising from that relationship, (3) causation, and (4) damages. *SK Partners I, LP v. Metro Consultants, Inc.*, 944 N.E.2d 414, 416 (Ill. App. Ct. 2011). In a professional negligence case, the relevant standard of care requires a defendant professional to act as an "ordinarily careful professional" would, meaning the professional must apply the same degree of knowledge, skill, and ability as an ordinarily careful professional would exercise in similar circumstances. *Bryant v. LaGrange Memorial Hospital*, 803 N.E.2d 76, 84 (Ill. App. Ct. 2003).

In its motion, AUL contends that it assumed no professional duty to police GCS's employee eligibility determinations. Moreover, AUL asserts that, as a non-fiduciary retirement service provider, it is not a "learned professional" like a lawyer or doctor who would be subject to a heightened standard of care. Its employees are not required to pass licensing exams like medical professionals, accountants, or architects, and some AUL employees are not required to have college degrees. AUL argues that, even if it were subject to a professional negligence claim, GCS forfeits such a claim in the absence of expert testimony regarding the standard of care. Additionally, AUL avers that the professional negligence claim also fails under the *Moorman* doctrine which bars recovery in tort for purely economic losses arising out of a failure to perform contractual obligations.

In opposition, GCS maintains that its claims fall within an exception to the expert testimony requirement for professional negligence actions because a lay juror could readily understand such negligence in this case and, in any event, AUL was grossly negligent.

Furthermore, GCS claims that an exception to the *Moorman* doctrine applies, namely where a plaintiff's damages were proximately caused by a negligent misrepresentation by a defendant in the business of supplying information for the guidance of others in their business transactions.

Here, the Court agrees with AUL that it is not subject to a heightened standard of care as a professional. Illinois recognizes that medical providers, architects, attorneys, accountants, actuaries, engineers, investment brokers, and other fiduciaries owe a professional duty of care. *See, e.g., Studt v. Sherman Health Systems*, 951 N.E.2d 1131 (Ill. 2011) (physician)*; Thompson v. Gordon*, 948 N.E.2d 39 (Ill. 2011) (engineer); *Landreth v. Raymond P. Fabricius, P.C.*, 109 N.E.3d 225 (Ill. App. Ct. 2018) (law firm and attorney); *compare Myers,* 820 N.E.2d at 610 (certified nursing assistant's actions in moving nursing home resident did not constitute skilled medical care requiring a professional negligence instruction); *Tucker v. Soy Capital Bank and Trust Co.*, 974 N.E.2d 820, 833 (Ill. App. Ct. 2012) ("[a] bank is not a 'professional,' and thus there is no 'professional relationship'"). These fields are connected by common themes of specialized training, professional certification and testing, and specific skill and knowledge. The services offered by AUL—non-fiduciary employee benefit administrative support services—fall short of this professional mark. AUL asserts that its employees are not subject to licensing exams, nor are they required to receive higher education or hold a degree. GCS offers no argument in response to these points. The Court finds that AUL is not the type of professional subject to a heightened standard of care.

Because the Court finds that AUL is not subject to a heightened standard of professional care, AUL is entitled to summary judgment as to this claim (Count I).

III.     **Breach of Contract**

Under Illinois law, the elements for a breach of contract claim are: (1) the existence of a valid and enforceable contract, (2) plaintiff's substantial performance of the contract, (3) defendant's breach of the contract, and (4) resulting injury to the plaintiff. *Timan v. Ourada,* 972 N.E.2d 744, 751 (Ill. App. Ct. 2012); *Sevugan v. Direct Energy Services, LLC,* 931 F.3d 610, 614 (7th Cir. 2019). Every contract implies good faith and fair dealing between the parties, but such implied covenant of good faith cannot overrule or modify an express contractual term or impose an obligation that does not exist. *Bank One, Springfield v. Roscetti,* 723 N.E.2d 755, 764 (Ill. App. Ct. 1999). A claimed breach of good faith and fair dealing requires some ingredient of bad faith such as deceit, coercive behavior, or dishonest purpose. *Dunkin' Donuts Inc. v. N.A.S.T., Inc.,* 428 F. Supp. 2d 761, 774 (N.D. Ill. 2005).

AUL argues that the uncontroverted evidence demonstrates that it had no legal duty to inform GCS that excluding part-time employees violated the Plan. Pointing to the unambiguous terms of the administrative service agreements, AUL asserts that it never agreed to protect GCS from its own mistakes. The specific set of administrative services, according to AUL, did not involve Plan design or monitoring, determining employee eligibility, or ensuring GCS's compliance with Plan terms. AUL reiterates that it was neither the Plan administrator nor a named fiduciary for the Plan and that GCS, as the Plan's administrator, cannot outsource its ERISA obligations and fiduciary duties.

On the other hand, GCS criticizes AUL's classification of its contract claims. GCS asserts that AUL had a duty to conduct discrimination testing in good faith and without negligent or intentional misrepresentation and a duty to review GCS-provided data to determine whether flaws existed necessitating data reconstruction. Further, GCS argues that

duties of good faith and fair dealing are implied in any contract.

Under the administrative services agreement, AUL promised to provide full plan support including recordkeeping of participant eligibility and vesting, assistance with regulatory Plan testing, up to 10 hours of data reconciliation, and notification of data reconstruction needs (along with the implied duty of good faith and fair dealing in any contract). GCS has provided competent evidence, including deposition testimony and communications between employees of each party, that indicates AUL knew of a need for data reconstruction as GCS repeatedly failed testing over the course of several years yet failed to notify GCS of such a need. Moreover, GCS highlighted several facts in evidence that demonstrate AUL employees, on multiple occasions, attempted to conceal known flaws within the regulatory testing results by falsely indicating GCS passed the tests. AUL also omitted vital information from its internal compliance team when replying to GCS's inquiries concerning employee eligibility. GCS argues these misrepresentations and failures breached AUL's obligations under the agreement, especially for participant eligibility recordkeeping, conducting testing in good faith, and assessing the need for data reconstruction.

In light of the record, a genuine issue of material fact exists as to whether AUL failed to properly conduct testing, intentionally misrepresented testing results, or failed to review data in accordance with the service agreement between the parties. AUL has offered evidence, namely the contract, which demonstrates it does not have any express fiduciary duties or obligations to manage employee eligibility determinations. But GCS does not contest the fact that it held the primary responsibility for such determinations. Instead, as described above, GCS has provided competent evidence from which a reasonable fact finder could conclude that AUL breached its contractual duties under the operative administrative

services agreement, including its implied duty of good faith and fair dealing. A fact finder may be unconvinced by this evidence that AUL held any such duties under the agreement, let alone breached them, but that is an issue to be evaluated at trial.

Because GCS's breach of contract claim survives summary judgment, this case will proceed to trial. As such, the Court will now consider GCS's Motion for Jury Trial.

## IV.    Motion for Jury Trial

GCS originally filed this action in Illinois state court without a jury demand. Now, GCS requests that this case be tried in front of a jury arguing that its failure to request a jury was inadvertent, the switch to a jury trial will not prejudice AUL, and the issues are ultimately best suited for a jury. In response, AUL argues that this jury demand is excessively untimely, GCS received ample notice of the bench trial setting, and converting to a jury trial would cause unfair prejudice at this stage in the litigation.

Generally, "[o]n any issue triable of right by a jury, a party may demand a jury trial by serving the other parties with a written demand—which may be included in a pleading—no later than 14 days after the last pleading directed to the issue is served." FED. R. CIV. P. 38(b). Of course, a party waives a jury trial unless its demand is properly served and filed. FED. R. CIV. P. 38(d). But a district court retains discretion to, on motion, order a jury trial on any issue for which a jury might have been demanded. FED. R. CIV. P. 39(b). Such discretion must be exercised inside its proper context, and a "jury trial is not a minor feature of our judicial system, as the right of a litigant to have his fellow citizens hear and weigh the evidence is a hallmark of our jurisprudential system." *Liss v. TMS International, Inc.*, No. 19-cv-810, 2020 WL 12880836, at *1 (S.D. Ill. Apr. 30, 2020). Such a motion asserting an untimely jury demand must be supported by "a good reason for the belated demand[.]" *Olympia*

*Express, Inc. v. Linee Aeree Italiane, S.P.A.*, 509 F.3d 347, 352 (7th Cir. 2007). Five factors are routinely considered to assess such untimely jury trial requests: (1) whether the issues involved are best tried before a jury; (2) whether the court's schedule or that of the adverse party will be disrupted; (3) the degree of prejudice to the opposing party; (4) the length of delay; and (5) the reason for the movant's tardiness in demanding a jury trial. *Lee v. Love's Travel Stops &, Country Stores, Inc.*, No. 15-cv-07774, 2016 WL 1271052, at *1 (N.D. Ill. Mar. 29, 2016).

Regarding the first factor, GCS argues that this case concerns state law claims that are relatively uncomplicated and require credibility assessments of witnesses to determine what AUL knew during the events underlying the action. AUL argues that this is a complex case arising under an ERISA plan which would present a challenge for jurors to assess. As explained above, this case is not an ERISA case, but rather proceeds on a standard breach of contract claim. Such claims are routinely tried before juries. This factor weighs in favor of granting GCS's motion for jury trial.

Moving to the next factor, neither the Court's schedule nor AUL's will be substantially disrupted by permitting a jury trial. The trial setting in this case has been stayed pending resolution of the instant motions. A new trial date will need to be set regardless of whether the case proceeds as a bench or jury trial. AUL's schedule will be considered in determining the new trial setting, which avoids any disruption to its schedule. This factor weighs in favor of a jury trial.

The third factor, the degree of prejudice to the opposing party, weighs against a jury trial. GCS, without any rationale, states that AUL would not suffer prejudice in any way by switching to a jury trial format. Alternatively, AUL highlights many ways in which it could

be prejudiced. AUL argues that discovery has already concluded, and it has tailored its preparation to the bench trial setting, for example, it strategically opted against engaging expert witnesses. Referencing the realities of litigation, AUL notes that a jury trial increases time and costs because the parties must draft jury instructions, conduct voir dire, and engage in evidentiary disputes unique to jury trials. Indeed, the Seventh Circuit has recognized that Rule 38(b) sets a tight deadline for demanding a jury trial because preparation critically depends on whether the trial will proceed before a jury or a judge. *Olympia Express, Inc.*, 509 F.3d at 351.

Moving to the length of delay, this factor also weighs against a jury trial. Here, the length of delay exceeds a year and a half. The case was removed on September 15, 2020, and GCS filed its motion for jury trial on April 5, 2022, after dispositive motions were filed. Courts have found the length of delay significant where requests were untimely by over a year. *See AM Int'l, Inc. v. Eastman Kodak Co.*, 648 F. Supp. 506, 508 (N.D. Ill. 1986) (denied motion for untimely jury demand brought six years after action commenced); *Early v. Bankers Life and Casualty Co.*, 853 F. Supp. 268, 272 (N.D. Ill. 1994) (denied motion for untimely jury demand brought 19 months after prescribed time period expired); *but see Lee*, 2016 WL 1271052, at *2 (granting motion for late jury demand with four month length of delay). The Court finds the length of delay is significant here.

The last factor to consider looks to GCS's reasoning for its tardiness in demanding a jury. This is the most significant consideration in this analysis. *Electro-Brand, Inc. v. MEM-CE, L.L.C.*, No. 17 C 3554, 2018 WL 1189691, at *4 (N.D. Ill. Mar. 7, 2018). GCS emphasizes that the delay occurred out of inadvertence. AUL criticizes this argument given GCS had multiple opportunities to recognize and correct its failure to demand a jury. Originally, GCS filed this

action in Illinois state court and failed to demand a jury trial. Then, because AUL removed the action to federal court, GCS could have demanded a jury trial within 14 days as permitted by the Federal Rules of Civil Procedure. But GCS did not take this second chance to do so. Moreover, several docket entries reference a scheduled presumptive *bench* trial month, which should have alerted GCS to its mistake. (*See* Docs. 21; 34; 42).

Overall, the Court finds that these factors weigh against the untimely jury demand. Based on the analysis above, the Court denies GCS's Motion for Jury Trial. As such, this case shall proceed as originally planned through a bench trial.

CONCLUSION

For the reasons set forth above, the Motion for Summary Judgment (Doc. 39) filed by Defendant American United Life Insurance Company is **GRANTED in part** as to Count I for Professional Negligence and **DENIED in part** as to Count II for Breach of Contract. AUL's Motion for Summary Judgment is also **DENIED in part** on the basis of ERISA preemption. The Motion for Jury Trial (Doc. 43) by Plaintiff GCS Credit Union is **DENIED.**

The Court will set a status conference by separate order for the purpose of discussing the next steps needed to bring this action to resolution.

**IT IS SO ORDERED.**

**DATED:  March 31, 2023**

**NANCY J. ROSENSTENGEL**
**Chief U.S. District Judge**